Case number 23-2835 from the District of South Dakota, United States v. Michael Hoeft. We'll give the people a minute to kind of leave and get situated and looks like they're all out now. Mr. Ramstad, when you're ready, you may proceed. Thank you, Judge Erickson. May it please the court, counsel. My name is Rick Ramstad and I have the privilege of representing Michael Hoeft in these proceedings today. Mr. Hoeft was convicted following jury trial of possession with intent to distribute a controlled substance, in this case methamphetamine, and possession of a firearm by a prohibited person based upon a prior felony conviction and a conviction for a misdemeanor crime of domestic violence. On appeal, as in the brief, Mr. Hoeft has presented four issues for this court's consideration. Counsel, maybe the mics, but I'm having a little hard time hearing. Oh, I think it's... If you just keep it in mind, I'd appreciate it. Sure, and I'll speak up. The first issue that we presented on appeal is whether the court erred in denying Mr. Hoeft's motion to suppress evidence seized from this person at the time of his arrest. Second, did the court err in denying Mr. Hoeft's motion to dismiss the indictment? Third, did the government fail to prove the case beyond a reasonable doubt? In other words, was the evidence sufficient to support the conviction? And finally, did the court err in denying Mr. Hoeft's motion to admit statements made by a chemical dependency counselor for the purposes of chemical dependency treatment? Today, I intend to focus on Mr. Hoeft's motion to suppress and the district court's evidentiary ruling, which really dovetails into the sufficiency of the evidence issue as well. Counsel, there was a lot of discussion in the briefs in this case about the timing of the seizure, Mr. Hoeft. What is the legal significance of when that seizure occurred? The seizure, and it probably comes down to a matter of moments, because the officers had approached the vehicle and had a conversation with Mr. Hoeft. And in that conversation, he dispels the first basis for escalating this to a Terry stop. And he has a coherent, rational conversation with the officers where he tells them that he's doing just fine. A review of the video, that was admitted trial of evidence. There's nothing in there suggesting the fact that he has any sort of medical condition. But you would agree that they had received a call from the owner of the facility, the officers had. And when they arrived, they parked there with someone either sleeping or slumped over the wheel. Why wouldn't that be a basis for a Terry stop in itself? Well, because the situation resolved itself with respect to the issue of, the call started out as a man down call or a person in need of assistance. And it became readily apparent just in the first few moments of the encounter that Mr. Hoeft was not a man down or in need of assistance. Well, wasn't there reasonable suspicion of trespassing at that point or driving under the influence? We have cases that suggest that when you find someone slumping or sleeping, that's enough to satisfy a reasonable suspicion, and then the investigation may proceed. And that's where I get, I think that's where I struggle with your argument on the motion to suppress. So I would preface my argument by saying I realize the court has made a general observation that someone sleeping behind the wheel can be racist. Well, it's more than that. It's more than that. Here's what they know when they approach the vehicle. There's a call, and the call, you know, indicates that there's a trespasser with a person who's a man down in the car. They parked the cars in a way that you can't drive forward, but you can still drive backwards, and you can walk away, right? So no seizure when the police just drive up and just stop. Now the police walk towards the car, and before anyone actually does anything, says anything, there's an observation by the second officer, who actually speaks to the defendant, but that officer speaks first on the video. And that officer says, there's a crossbow, and it's apparently, that's what he says, there's a crossbow. That indicates he's armed. Now they approach there, they say, that person's armed. Then they see he's still slumped over. Keys are in the ignition. Under South Dakota law, actual physical control of a vehicle while under the influence is a crime. He slumped over. They have no reason to know why he slumped over. Now that's all a reasonable and articulable suspicion at that point. Now what you're saying is you dissipate the suspicion when he wakes up, and they say, when he says, I'm perfectly fine. Now is that really sufficient to compel the law enforcement officer to sort of give up the inquiry at that point? Terry's all evaporated. You know, because under Terry, it's all about what? Officer safety. So say, hold on, think there's a weapon in here, we'd like you to step out of the car, and of course that's when it goes from like 0 to 180 miles an hour in 1.9 milliseconds. You know, it was a strange encounter that way, but that's, you know, and that matters to some degree, but in the end, you've got to argue that they had no right to ask him to step out of the vehicle at that point. That they were obligated to leave. Right? I think that they were obligated, they certainly could have continued the conversation to further dispel anything but all of the initial indications. He was alert. He said, I'm fine. He went on to tell them that he was at this facility in order to drop off some stuff that was in the back of his pickup. That was objectively, the officers did note that there was a number of items in the back of the pickup. So, and with respect to the influence, I think the officers' initial observations would lead them to conclude that simply wasn't the case. People don't like, people... Maybe, maybe not. I once had a case, and I've tried more DOI trials than any man alive, you know, presided over more of them because I was a state judge for a million years. But I will just tell you that I once saw a case where a guy seemed to be perfectly sober, the body cam was just astonishing. And when they asked him if he would just step out of the vehicle because the officer thought he might have smelled alcohol, the dude fell out of the truck, because he was driving a semi, and he actually blew a .4. Think about that number. Right? And he looked apparently sober. I mean, so do you think the experienced law enforcement officer would just say, he responded correctly to the question, our inquiry is over? No, but as you pointed out, Judge Erickson, the situation flipped in milliseconds. Mr. Hoff says, you know, let me guess, and you know, whether you call it order or request or command, let me guess, and he was out. I do need, they do observe the crossbow in the vehicle. Do you have reason? They know that he's armed with a crossbow to the extent that it's any sort of under the circumstances presented here. And these cases, of course, there is no litmus test. Every case is considered on the exact facts of its case. But this is an unwieldy device that he wasn't going to turn and be able to deploy in any effective manner. Yes, maybe he's Legolas, man. You know? Sorry. I didn't mean that. But those are relevant facts, and I understand the court's concern with them. But the issue is, and I think counsel before me, who represented Mr. Hoft on the actual suppression issue, took the position that he was seized immediately upon entry of the facility. That's not the position that I would advance to this court. I think at the moment that he was conscious, he was for all intents and purposes seized, and that's where I would leave that argument. Can I ask you quickly about the 8034 issue? The prior statements or the statements to the, I think was it a doctor or a counselor in this case? Who has the burden in your view of establishing the purpose in a criminal trial when we're doing this analysis? I think we have case law that, I don't know that it's specifically criminal, that suggests it's the proponent of the evidence. Do you think that applies in a criminal case? I'm sorry, I missed the gist of the question. Who has the burden of proving? Who has the burden of, yeah, in other words, we generally put it on the proponent to show that the purpose was for medical treatment to trigger the exception. And my question to you, and maybe you haven't thought about it, maybe you have, is whether that is fair in a criminal case where a criminal defendant bears the burden of introducing evidence in support of his defense. Or maybe our case law controls, I don't know. Well, the rule itself, I think probably in more respects isn't geared towards criminal cases, but it's been used for criminal cases. And I haven't seen one of these before, I haven't been around that long, but I haven't seen a case like this where a defendant wants to admit it and the district court excludes it. Well, that happens, if you think about it. I'm sorry, I'm a step behind your question. But here's what I'm looking, as I look at it. Under 803.04, we ordinarily say the proponent of the evidence always has the duty to show admissibility, right? And so you have to come forward with a basis for admissibility. You said 803 subsection 4, not you, the prior counsel. That was me actually. That was you actually, okay. So at that point, what you've got going down is the judge needs to make a preconditional finding of fact, right? Under rule, I think it's 104, where the judge is supposed to make necessary fact findings to determine the admissibility of evidence. So the trial judge makes a decision that says wasn't made in the furtherance of treatment, right? That's the basis for the judge's ruling. So at this point, as a proponent of the evidence, I think the burden's on you to show that that's an abuse of discretion or that finding, you know, because that's either a mixed question of fact and law. And if it's a law question, you say that it's an abuse of discretion. Or you say that's a clearly erroneous fact. But either way, you've got to attack that fact finding by Judge Schreier here, right? And then there's the second question that I've got that, and so I'm going to throw this all out to you at once and let you address it because I'm prone to give speeches. But the other thing is, is that, you know, at no point did, in the case of the trial, did anyone argue that the defendant was now being compelled to testify? And once the defendant took the stand and pointed out that he told the person in treatment, now that fact's in front of the jury, does it need to get there otherwise? Well, that would be part of my argument that the judge's ruling essentially compelled him to testify because there would be no other method for him to demonstrate the quantity of his daily use. And that does not need to be noted in the record, right? We don't need to, you know, you're saying we don't require counsel to stand up and say, Judge, because of your phony argument, right? We don't make people do that. That's your essential argument. But the record before the trial court was made, the government put into the record that most of the people who are a large share of, it's regular, that people who are incarcerated within the county jail, when they come in there, they ask to have, to go through treatment. And on one hand, the purpose of that is maybe they need treatment to overcome their addiction or maybe they want to put themselves in their best light for the purpose of sentencing. But here, the district court made the factual determination that it seemed more likely that Mr. Holf was trying to set up his sufficiency or his theory of defense with respect to personal use and I don't think that that wasn't any of the evidence that he had. That was certainly in the record with respect to why people do this. And it may have went to the weight of the evidence, but Rule 803.4 specifically prescribes that for the purpose of treatment, which was what my client was doing, that this is admissible testimony. And I just wanted to distinguish it because the Rule 807, the catch-all exception, provides specific language that whether or not the statements were made with indicia of trustworthiness is something the court is supposed to specifically look at. But going back to the text of the rule at issue, that language is not there. And specifically, this rule rejected the historical premise that you couldn't, for example, hire an expert physician and have your client make a statement to that physician and then all of a sudden use that client's or that expert's testimony based upon the client's statements. And that's essentially what we have here. And the rule and the draft advisory committee notes, that has been rejected. I would like to reserve. Counsel, I don't have much time. You've raised a couple of Second Amendment issues under Bruin on behalf of Mr. Hoeften. Yes. I'd like to ask you a question. If we determine that the section 922G1, felon in possession issue is controlled by Eighth Circuit precedent, do we need to reach the 922G9 issue for domestic violence misdemeanor? Well, the way that I read it, Jackson, unfortunately, I would, on behalf of my client, say that you wouldn't. It's certainly within the scope of the legislative function. But I would reiterate as I've set forth in my brief that there was no type of historical traditional legislation with respect to misdemeanor crimes and the dispossession of felons. I don't have all that in the circuit. But I guess I was just thinking, if he's been convicted of a felony for purposes of 922G1, why would we reach the other issue? It does render it moot. I would say that. Thank you. Mr. Kelderman. May it please the court and counsel, I'm Eric Kelderman. I'm an assistant U.S. attorney arguing on behalf of the United States in this matter. The United States believes that the district court properly ruled that no seizure of the defendant occurred and all the evidence obtained during the encounter with law enforcement was obtained properly and it was properly admissible in the case. The court properly denied dismissal of the indictment or of the charge for the felon in possession and domestic violence offender in possession of a firearm based on prior precedent as was discussed just a moment ago. Counsel, the government has characterized the encounter initially as a consensual interaction. I'm not sure I'm following that. It seems to me it's more of a community caretaker situation. Why would it be consensual? Well, there was nothing about it that turned it into any forceful encounter or any non-consensual encounter because the defendant was never seized. He was never ordered to do anything at least until the situation turned into something other than just a consensual encounter. The officers show up at this storage facility. They park 30 to 50 feet away. The defendant has the ability, Mr. Heft has the ability to get out of his vehicle if he wants to. Now they're there. The circumstances are strange and they know that they're strange when they pull up. They have a report of basically a trespasser. The facility has called the police and said, we have a guy here and he's asleep in a vehicle. They see that the lights are on. I think the headlights and the running lights were on in this vehicle. It's 9.30 in the morning. They walk up. The vehicle is not running. But the ignition is on and they can see that. And they can also see that the vehicle is in gear. So it's almost like it stalled when a person let the clutch out too quickly or something. It's a manual transmission. There's a crossbow right next to this man's hands, right hand. It's setting right there. And they're thinking this is a dangerous situation. He's passed out. So much like encounters where law enforcement find a person in a vehicle in a parking lot, passed out at a hotel. I remember reading about different cases like this. Under South Dakota law, being in control of that vehicle, even on private property, is, if the person is impaired, if the person is intoxicated, it can be a DUI. It can be a state charge, misdemeanor charge for that. But at this point what we've got, if you think about it, is that, and we look at what the officer testified and what they were told. Now the officer told us that the dispastors told them that there was a person who doesn't belong to the storage unit. He's passed out, slumped over, and then the officer goes on to say, so it was kind of checked the well-being kind of a situation. But the reality of it is, while the officer says it's a kind of a community caretaker thing, the officer starts out by laying in a reasonable and articulate suspicion that a crime is foot. That is, trespass. And so at that point, as the officer approaches, because we're applying not a subjective standard but an objective standard, what would an objective officer who's been told this believe? He would believe two things. One, it might not be well. Two, he's trespassing. And so one of them is a community caretaker basis, but the other one is crime is a foot. And it's articulable because it was articulated, right? And so once we get to that point, isn't our real concern not about what happens when you first walk up there or even first contact? It is how does it develop after that? And the magic moment is before it denigrates into a physical confrontation is really the point where they say, I'm a little uncomfortable because of that crossbow. Will you step out? And Mr. Holt refuses, right? And, you know, at that point, don't they still have, you know, the reasonable articulable suspicion and a concern for their safety? And isn't that always enough to get the guy out of the car? Without a doubt, Your Honor. I believe that the court has articulated better than I exactly how this is supposed to go down and how the law allows it to go down. Because as you noted, there is a crime going on, and they're trying to figure out if there's another crime going on. Often when an officer pulls someone over, they don't know for sure that there's going to be a DUI or that the person is impaired. This is a situation where they pull up, they know that there's a trespass. At least they reasonably have information because the — That's right. Because they don't really have probable cause at this point. They just have somebody says. They don't belong here. You know, it could turn out that he did in fact have a lease and he would have the right to be on the premises. But the officer doesn't know that at this point, so it's still an investigatory stop, right? It absolutely is. And they are trying to investigate. They're trying to figure out what's going on. But they see a crossbow with a bolt in it. And so this crossbow is essentially ready to go. And Officer McGillivray, she's the one that first said, that crossbow makes me nervous. Will you step out? Her exact words were, why don't you step out for me? And she's requesting that he does. Now, as you noted moments ago, Judge Erickson, the situation can evolve very quickly. And so it doesn't take long from her request to a demand or a command, I should say. She makes a command of him because he's doing things — well, he immediately goes on the fight. She sees that he's not going to comply. And they're trying to — they know that the keys are in there. This thing is in gear. You know, the crossbow, everything about this is a situation where it's a difficult situation for an officer. This can get dangerous very quickly. And in a lot of ways, it did. Because Heft goes on the fight almost immediately. He is ready to be angry. He's ready to be offended. She sees that he's not going to comply. She opens the door. And she says, step on out for me. This is after she said, that crossbow is making me nervous. He responds, you're making me nervous. Well, he's not complying. And his language and the way that he says it is indicating, I am not going to go along with this. So we now know why. I'm sorry? We now know why he was uncomfortable, right? Because he had methamphetamine in his possession. Right. So the possession of meth seems to me to be clear-cut. I think the closer — and this is a close case, I think, on possession with intent. What is it that gets you to the inference of intent? I mean, we have, as I understand it here, you know, where is it? The number of grams. It's fairly low here. We've got a scale. Does the quantity alone get you to intent to distribute? Or do you need the scale or something else to get there? Because, I mean, we have cases out there, White, Franklin, that are pretty similar where we expressed doubts or find, look, there's no sufficient evidence of intent to distribute here. And especially when you combine it with his story, which he also told to the medical provider, and that is, hey, I'm not just a user. I'm a heavy user. It takes more than just the amount of drugs. There's a case, and I believe it's cited in the brief. I can't think of it at this moment. I believe it's called Thomas. It depends, right? Because you can get to 12 pounds, right? And then the quantity alone. We have cases that say that, hey, whatever 3 pounds is, that's not a user amount, right? But here, if you look at the evidence, aren't we seeing that he's got, what is it, 67 grams or something like that? I don't remember. But something in north of 60, south of 80. Correct, Your Honor. And so that, even for a guy that's using two teeners a day, that's a week's worth of meth. That's an unusual user quantity, you know, if you just look at it. The officers are going to testify. That's a sale quantity. We have some packaging issues here that are weird, you know, because we've got the meth is divided into, what's it, four parcels? And two of the parcels are cleared user amounts. And then two of the parcels are strange amounts, because they aren't packaged for sale, and they don't come to, you know, the right amount of grams to be, like, it's not a teener, it's not, you know, it's, they're just kind of a quantity of meth. And he got a guy who's living in his truck, right? Now is all of that enough to get you there? Along with the rest of the evidence, Your Honor. He had a scale on him. I forgot the scale. He had a special agent per cell. He testified as an expert. He was noticed as an expert. And he has a lot of experience in investigating these matters. And he talked about what you see with users is oftentimes there will be, they'll have a gram on them. Sometimes an eight ball, which is 3.5 grams, an eighth of an ounce. Sometimes two. But beyond that, users don't carry around... Except if you're living in your truck, right? Well, he also... Down by the river in this case. I'm sorry? You know, he's living in his truck down by the river. Saturday Night Live references. Thank you. But this is his home, in other words, right? So he's not carrying it in the sense that he's arguably storing it. Maybe that's just a jury question. Would you agree there's no direct evidence of distribution in this case? There was no evidence put on that he distributed to any other individual. The amounts, Judge Erickson, one of the bags that he had in his coat was 27.7 grams. That's just shy of a full ounce, which is 28.3. So we're looking... And then the other one was, I believe, 41, which is roughly an ounce and a half. And you hear about people buying the eight balls, like I mentioned, but they sell these things in half ounces and ounces. But those amounts, and then you get the 99% purity. Those are things that the court can look at and that the jury, more importantly, can look at to determine if it's a distribution amount or if it was possessed with the intent to distribute. Does it really come down to deference to the fairness of the jury? No doubt it does, Your Honor. It's a matter where the jury was properly instructed. They had Special Agent Purcell's testimony explaining, here's what you see with distribution. Special Agent Purcell was fair because he said, I've seen special agents or I've heard them say that scales are indicative of distribution. Isn't it all the more important then that he be allowed to introduce that 8034 evidence? He put in that evidence, Your Honor. Well, but he was forced to, the argument the counsel suggested, he was forced to testify, which may or may not, on the whole, have been good. But he had another arguable alternative here, and that was the 8034, which the district court excluded. The district court looked at it and said, by the time he made this statement to his counselor, that I believe it was he uses up to seven grams a day, which is, again, an amount that Special Agent Purcell said he'd never heard of. He'd never heard of anyone, even a heavy user, using that amount. But the statement was that he used seven grams a day, and he got to testify about that. He got to testify about how he uses it and how he dissolves the methamphetamine into, by pulling a syringe and getting some blood into the meth, the crystals in the syringe. All that would have been accomplished by getting that evidence in was just another helping of the same thing, where it's clearly a statement that he's made. Was this credibility attacked in cross relating to the amount of use? I believe it was, Your Honor, yes. I can't specifically remember exactly the language or the questions that were asked, but I believe that it was. But all it would be is a counselor getting on the stand and saying, yes, he told me this. Well, when did he tell you this? He told me this in, I believe it was early November of 2021, and he'd already been charged with possession with intent to distribute. So he had a motivation to tell, to say that this was just a user amount. But here's the thing about that. Here's the deal with treatment, if you think about it. What do we want when they go in to talk to a guy who's doing an evaluation? The first thing they tell you is they give us a complete and truthful analysis of your use. We want to know what you're using, how much you're using, when you're using it, which is what he gave here. And so that seems like it's usually in the course of treatment, right? On the flip side, what we know is that the rule exists the way it does, because what we hate is when the guy goes in to talk to the guy in the emergency room and lays in his self-defense defense in its entirety to the nurse, and we say, well, whatever that is, that is not, you know, for purposes of treatment. There's something else going on here. This is a really hard question, you know, factually, because it's somewhere in between. Because it does lay in his defense, which by the time he's being evaluated, he likely anticipates, right? But it also is the kind of stuff that is ordinarily given to people for treatment. And so now we have a very experienced trial judge who makes a decision, and the question on that evidentiary question is abuse of discretion. Why wasn't it in abuse of discretion for Judge Schreier to say, I think this is more laying in the defense than it is looking for treatment? Unlike the situation where someone is in an emergency room and they're making statements laying out their defense, this is a person who is just going to see a counselor possibly to get out of jail, and also he knows what the charges are. He's got more time to think about this. This is a process that he was able to go through. I mean, you're essentially ending up then with a per se rule. I'm pretty close to it that says post-arrest treatment is excluded. It is a discretionary matter, and as Judge Erickson pointed out, it is an experienced judge who made the assessment that this looks like it was a setup, and he's trying to explain his defense and provide his defense and get a second helping of it to be able to put it in front of the jury. May I ask one more question? You may. I'd like to ask you a Bruin question. The government has taken the position in this case, and I'll quote, the government can prohibit people who have shown disrespect for societal norms from possessing firearms. That's a very broad statement. How do you square that with Bruin? Well, Your Honor, I believe that the context of that is in light of the Jackson opinion. I believe Jackson is the controlling authority for this. Jackson is — I believe it's an accurate statement based on Jackson, but to the extent it's not, the United States position is consistent with Jackson. Under that formulation of the law, I don't think any misdemeanor conviction could be used as a basis for stripping someone of their Second Amendment rights. And that's where the historical traditions come in, and Jackson laid those out. I understand that this panel and Judge Strauss saw it differently, but the historical tradition has been explained, and far better than I could possibly do, that felons — But showing disrespect for societal norms seems rather broad. We are who we are, right? In your world, this is a nightmare scenario. You look at it and say, okay, we've got three Jackson dissenters sitting here, and there's only four on the whole court. How in the hell could that have happened to me? On the other hand, the 921G conviction looks like it's probably clearly controlled by Jackson, and while we can say all we want about your overbroad statements, we may very well be stuck where we're stuck. Okay, I got that, right? But I do have this that I might throw out there, is that under Heller there is that language that talks about law-abiding citizens, and that has to somehow under Bruin to be tied to the historical traditions, and as you understand, there's a division on our court as to what historical traditions are sufficient. But, you know, I think your language, which I think is slightly broader than you need it to be, and you might really have wanted to have thought about couching it, and just, I'm quoting Heller now, you know, because then he wouldn't be answering this, and now it's gone on for a long time, but I think that's really the issue for us as a court, is like, does Jackson render everything else moot so it doesn't matter? And then we have a facial challenge rather than a supplied challenge, so, you know, then we've got to look at the statute. We're just in Bruin land entirely, and what Bruin's going to mean come July 1, we don't know, but we know what we think it means now, and we know what our colleagues think it means now, so we are where we are. Anyhow, that's the end of that filibuster. Anybody have any other questions? Counsel, I just want to make sure that my comment about your client's living conditions was not meant to denigrate him. It just was what it was, so I hope you did not find that common offense. It was not intended to be. Yeah. All right, you may step down, Mr. Kelderman, and here's the deal. Since I filibustered Mr. Ramstad's argument, I'm going to give him two more minutes. It's probably about half the time I made speeches. Thank you, Your Honor. Thank you, Your Honor. A couple of issues that I'd like to address and reply with respect to the possession with intent. The evidence that the government had was the quantity. If you used what my client testified to, his personal daily use on average, it was about a week's supply, seven grams a day. Well, the problem is because he lived in that truck, he had other things, right? He had a scale with him. He had a crossbow with him, which I think he said he was used hunting. He had a pistol with strange ammunition, including two hollow points, which are generally not used to hunt. I mean, isn't that enough to get it past the burden, which is fairly low? The ammunition, I think, is worth mentioning because part of it was birdshot. I understand that perhaps someone who distributes drugs would carry any weapon, and even a .22. But the birdshot, I think, distinguishes this case. Yes, there were some hollow points, but in the .22 world, those are a dime a dozen. Yes, it's a weird thing, but it's a revolver, right? So we've got different purposes, right, that he's got? Am I right on that, or was it not a revolver? No, I think it was a pistol. It was a pistol, okay. So now it's really odd because it becomes, doesn't the issue matter which rounds are closest to the chamber? And they were the hollow point rounds then, right? That is not in the record. Is that not in the record? My client would assert it was the birdshot, but it is not in the record. None of that's in the record. Okay, so that doesn't really matter. What was his testimony? Was his testimony that he used the pistol for hunting? The real testimony came from a recorded phone call that he made from the jail, indicating that he was using the pistol to hunt rodents, small birds. I think he was down by the river, and perhaps there were some pheasants down there. The other question, I do have one question that I think I want you to address, and that is, you know, when it comes to the whole question of the user quantity, if you look at all the evidence in this case, you were fairly allowed to argue that what we had was somewhere between a week and ten days' worth of methamphetamine for a really heavy user, and really five or six days if the guy uses like my guy says, but in any event, even if it's ten days, and he's basically living in his truck, and it's a personal use quantity. If the judge properly instructs the jury, the jury hears your argument, they hear the government's argument. Why is that the jury's verdict, when viewed in a light, most favorable to it? Why isn't that evidence sufficient, number one? And number two, if it's not sufficient, really part of our error here is that the judge should never have let that question go to the jury, because once it gets to the jury, if it's an open question, if there's sufficient evidence from which a jury could find, then it's the jury's call, given the way it was argued. And that's where I think that precluding the admission of the chemical dependency evaluator and her testimony was prejudicial to my client, because I think that whatever question the jury might have had about whether one could get to seven days would have been supported by that testimony. We also had a cross-examination of the agent who kept with a lower quantity. There was a National Highway Traffic Safety Association study that suggested users could be using up to five grams a day, which was undisputed. And that's why we think that the evidence just couldn't be supported. Thank you. Thank you. This case is really fascinating. It's been well-briefed and well-argued, and we'll take it under advisement. And I just want to thank you for your time and your willingness to argue here in front of the university and the students here. It's important educationally. So thank you for being here.